UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                        Case No. 24-40011-TC

MARGARET E. SHAFE,                        Topeka, Kansas
                                          Date:  March 11, 2024
    Defendant.
....................                      (Pages 1-21)


TRANSCRIPTION OF
DETENTION HEARING

BEFORE THE HONORABLE RACHEL E. SCHWARTZ
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

| For the Plaintiff: | Ms. Sara L. Walton<br>United States Attorney's Office<br>290 U.S. Courthouse<br>444 Southeast Quincy<br>Topeka, Kansas 66683 |
|---|---|
| | Ms. Robin A. Graham<br>Office of Staff Judge Advocate -<br> Fort Riley<br>216 Custer Avenue<br>Room 127<br>Fort Riley, Kansas 66442 |
| For the Defendant: | Mr. Thomas W. Bartee<br>Ms. Jennifer A. Amyx<br>Federal Public Defender's Office<br>632 Van Buren Street<br>Suite 200<br>Topeka, Kansas 66603 |

Proceedings recorded by digital audio-recording.  Transcript
produced by machine shorthand and computer-aided transcription.

24-40011  USA v. Margaret E. Shafe  03.11.24                    2

```
 1              (Called to order).

 2         THE COURT:  Good afternoon.  We are here in the case

   United States of America versus Margaret Shafe, Case

 4   No. 24-40011.

 5         Counsel, may I please have the appearances starting

 6   with counsel for the government.

 7         MS. WALTON:  Good afternoon, Your Honor.  May it

 8   please the court.  The United States appears by and through

 9   Sara Walton and Robin Graham.

10         MR. BARTEE:  Good afternoon, Your Honor, and may it

11   please the court.  Ms. Shafe appears in person and by and

12   through counsel, Tom Bartee and Jennifer Amyx.

13         THE COURT:  Thank you.

14         And welcome, Ms. Shafe.

15         Let me start today by noting for the record that we do

16   have a conference call number set up today at the request of

17   the government and pursuant to the Crime Victims' Rights Act

18   that is allowing individuals who fall within the scope of that

19   act to listen in on the hearing today.  There is not an

20   intention by the court to allow anyone -- anyone listening by

21   phone to participate in the hearing today, but it does allow

22   them to hear what is happening today in our hearing.

23         So let me just remind counsel to make sure you're

24   speaking into the microphones today so that someone listening

25   can hear.
```

1          I will also note for the record we had reached out to

2     the defendant and my understanding was you were unopposed to

3     allowing that conference call to be set up today; is that

4     correct?

5          MS. AMYX:  That's correct, Your Honor.  The defense

6     takes no position with regards to whether the Crime Victims Act

7     applies in this matter.  However, upon the government's request

8     we had no objection to the family being able to attend by

9     video-conferencing software.  Thank you.

10         THE COURT:  All right.  Let me confirm that we are in

11    the same position today that we were at our last hearing.

12         Is the government still moving for pretrial detention?

13         MS. WALTON:  We are, Your Honor.

14         THE COURT:  And, Mr. Bartee and Ms. Amyx, are you

15    requesting a detention hearing today?

16         MS. AMYX:  That's correct, Your Honor.

17         THE COURT:  Okay.

18         MS. AMYX:  We're not electing to waive.

19         THE COURT:  All right.  Ms. Walton, let me start with

20    the basis for the government moving for detention.  Under

21    which -- we may just have a little bit of background noise.

22         Under which 18 U.S.C. Section 3142(f) section does the

23    government move for detention?  Is it (f)(1) and/or (f)(2)?

24         MS. WALTON:  It is (f)(1), Your Honor.

25         THE COURT:  And which provision of (f)(1)?

1          MS. WALTON:   Provisions (A) and (B).   (A) as the

2    defendant is charged with a crime of violence, specifically

3    18 U.S.C. 1111.   And then subsection (B) as well, as the

4    defendant is charged with an offense for which the maximum

5    sentence is life imprisonment or death.

6          THE COURT:   And is the government contending pursuant

7    to 18 U.S.C. 3142(e)(1) that the issue is the risk of

8    non-appearance or the safety of any other person in the

9    community?

10          MS. WALTON:   Both, Your Honor.

11          THE COURT:   And does the government contend that there

12    is a rebuttable presumption that applies here?

13          MS. WALTON:   We do not.

14          THE COURT:   Ms. Amyx, Mr. Bartee, whichever of you

15    wishes to answer this question, I want to make sure that

16    there's not an objection that the government has a basis to

17    move pursuant to 18 U.S.C. 3142(f)(1)(A) and (B).

18          MR. BARTEE:   Your Honor, we concede that the

19    government has a basis to move under (f)(1)(B).  (f)(1)(A) might

20    present some more difficult issues, but we definitely agree

21    that (f)(1)(B) constitutes a basis for this.

22          THE COURT:   Is the issue whether it's a crime of

23    violence?   Is that the question with regard to (1) --

24          MR. BARTEE:   Yes, Your Honor.

25          THE COURT:   -- or (A)?

24-40011  USA v. Margaret E. Shafe  03.11.24                    5

1          MR. BARTEE:  The law on that can get involved so...

2          THE COURT:  All right.  Ms. Walton, how do you wish to

3    proceed today?

4          MS. WALTON:  By way of proffer, Your Honor.

5          Your Honor, the government will proceed by way of

6    proffer and with the introduction of an audio exhibit as part

7    of our presentation of evidence.

8          Looking through the 3142(g) factors, starting with the

9    nature and circumstances of the offense, this was a crime of

10   violence, it was a crime that involved a firearm, both of which

11   are congressionally enumerated factors for the court to

12   consider in its analysis under (g)(1).

13         The government contends that under (g)(1) this crime

14   also fits an enumerated factor in that minor victims were

15   involved.  The defendant shot her husband in their home while

16   two minor children were present.  One of those is a

17   nine-year-old daughter that Ms. Shafe shares with another

18   individual.

19         This nine-year-old was not only in the home when the

20   shooting occurred, she immediately called her father who lives

21   in Nebraska via her -- a tablet using the Google Meet service.

22   She was scared, she was upset.  She tells her dad that mom just

23   shot stepdad.  She then turns her tablet around so her father

24   can see the victim in this case - Greg - can see Greg lying on

25   the bathroom floor and a gun in the area.

1       The biological father in Nebraska is the only one to

2  call 911 to report the shooting.  He calls 911 and is directed

3  to the dispatch center in Lincoln, Nebraska where he lives.

4  They then provide him with the numbers for him to reach Fort

5  Riley where he makes a subsequent report of the shooting.

6       In addition to the nine-year-old in the home when the

7  offense occurred was Greg and the defendant's one-year-old

8  daughter.

9       After the defendant shoots Greg, she takes both girls

10 with her and drives away from the house.  When she is

11 approached at the Fort Riley gate both girls are unrestrained

12 in the front seat of the vehicle and later testing will show

13 that the defendant had consumed alcohol and was over the legal

14 limit in Kansas to operate a motor vehicle.

15      Although forensics are incomplete, from the initial

16 scene observations Greg was shot while on the landing in kind

17 of a center hallway of the upstairs of the family's home on

18 Fort Riley.  And this is not a very large area.  After being

19 shot Greg falls into the bathroom.  When first responders

20 arrive Greg was still alive.  He was transported ultimately to

21 Stormont-Vail here in Topeka and on February 20th, 2024, the

22 day after the shooting, he was pronounced dead.

23      The bullet entered Greg's face near his eye and exited

24 the backside of his head.  It was eventually -- the bullet was

25 eventually located embedded inside drywall of a room behind

1    where Greg had been standing when he was shot.  Markings

2    observed indicate that he was shot at close range and a firearm

3    was located near Greg in that small landing area of the

4    residence.

5             To understand the nature of the circumstances of the

6    offense, it is necessary to proffer some of the available

7    evidence of what happened before and after.

8             At 3:25 p.m. on February 19th Greg left Fort Riley.

9    Around 3:45 his co-worker, Army Private Dixon, texted Greg to

10   ask if he could borrow a piece of equipment, specifically a

11   helmet.  Greg responded that he was in town and he was not

12   home.  This is assumed to be referring to either Junction City

13   or Manhattan, Kansas.

14            Greg returns to Fort Riley around 6:15 that same night

15   based on gate footage as well as a text from Greg to Private

16   Dixon that Greg was back on base and headed home.

17            At 6:35 p.m., about 15-20 minutes later, Greg texted

18   Private Dixon to let him know that he's arrived back at his

19   house, and the drive from the gate that Greg entered to the

20   residence is consistent with that drive of about 10 to 15

21   minutes.

22            At 7:09 p.m. Private Dixon texted Greg that he is at

23   Greg's house.  Private Dixon reports the next day that he can

24   hear yelling from inside the residence and that he sees the

25   one-year-old daughter in the downstairs window.

1        At 7:11 p.m. Greg texted Private Dixon that he is on

2    his way outside.  Private Dixon waited in his car in the

3    driveway of the house.  When Greg came outside Private Dixon

4    reports that he, being Greg, looked worn-out.  When he came

5    outside he told him never to get married and that his wife had

6    just punched him in the face.

7        While Greg is outside at Private Dixon's vehicle, the

8    defendant also comes outside and is yelling at Greg while she

9    appears to be on a phone call.  Per Private Dixon she kept

10   saying things such as "you're going to get it" before going

11   back inside.

12       Greg then told Private Dixon to leave and Greg goes

13   back into the house.  Private Dixon drives away.  He estimated

14   that his interaction lasted approximately three to five

15   minutes.

16       By 7:23 p.m. Greg has been shot as that's the

17   time-stamp on the Google Meet call from the nine-year-old to

18   her father.

19       After the shooting, that 911 call does come in.  The

20   911 dispatch to Lincoln, Nebraska indicates that the

21   nine-year-old's father is in fear of what the defendant may do

22   to their daughter.  Once he's able to make contact with local

23   authorities at approximately 7:30 p.m., an alarm is sounded and

24   first responders are en route.  And by 7:35 p.m. fire and EMS

25   have arrived on scene as well as MPs, military police, and the

1    defendant and the girls are not in the home.

2          After the shooting occurred, the defendant left the

3    residence.  She left her cell phone in the couple's bedroom on

4    a dresser.  She left Fort Riley at approximately 7:41 p.m. but

5    immediately turned around outside of the gate and is contacted

6    by the security agents there.

7          When contacted she gets out of the vehicle that she's

8    driving, which was identified as Greg's truck.  She's barefoot,

9    she sits down on the curb.  Both girls are with her, they're in

10   their pajamas unrestrained in the front seat.

11         When the defendant makes contact with gate security,

12   she never asks them for help for Greg, never tells the gate

13   guards that she shot Greg.  Eventually she is arrested and

14   taken to holding and she's overheard stating, "I loved him.  I

15   loved him and I killed him."

16         The FBI is called in to lead the investigation fairly

17   quickly after law enforcement is notified of the shooting and

18   the civilian status of the defendant.  Agents interviewed the

19   defendant in the early morning hours of February 20th, 2024.

20   Given that there was some concerns of her level of

21   intoxication, a breath alcohol test was performed and

22   three-and-a-half hours before she was interviewed but after she

23   drove her vehicle, the defendant's breath alcohol level was

24   .08.

25         During her interview with agents she admits to

1  shooting Greg.  She tells agents that they were having issues

2  in their marriage, including infidelity.  She makes no mention

3  of mental health struggles during that interview.

4          During a search of the couple's house agents locate

5  Greg's phone.  That phone was submitted for an expedited

6  analysis at Heart of America Regional Computer Forensics

7  Laboratory and, there, examiners located a recording that was

8  stored on Greg's phone that had been taken from February 19th

9  of 2024, the day of the shooting.

10         The recording starts at approximately 7:06 and is over

11 by 7:11.  This recording captures the defendant initially.  It

12 is -- it's hard to hear her as she's believed to be behind a

13 closed door, but it captures her and the defendant's *[sic]*

14 exchange just prior to Private Dixon arriving, so just

15 moments -- minutes before the shooting occurred.

16         At this time the government would proffer that

17 recording for the court.

18         (Recording was played).

19         MS. WALTON:  Moving to the (g)(2) factors, looking at

20 the weight of the evidence, the grand jury did return an

21 indictment for first-degree murder.  The defendant confessed to

22 shooting Greg.  There was only one firearm located in the home,

23 identified as belonging to Greg.  Forensics are still

24 outstanding, but it is believed that that is the murder weapon

25 in this case.

1           When moving to the (g)(3)(A) factors, looking at the

2    history and characteristics of the defendant, the information

3    that the government has comes primarily from Greg's family as

4    the defendant elected to not sit with probation, which would

5    typically be the source of a lot of -- a lot of this

6    information.

7           Regarding the defendant's character, from the

8    interviews conducted with family it appears that she -- she's

9    typically described as a recluse.  Before the couple moved to

10   Fort Riley in October of 2022 they lived with Greg's parents

11   near Pittsburg, Kansas and while Greg was at basic training the

12   defendant stayed there with his family.

13          Greg has been described as the primary caregiver.  The

14   family reports that when they would come over to visit, the

15   defendant would lock herself upstairs in the bedroom and not

16   have very much interaction with them.

17          Oftentimes when Greg was working or unable to care for

18   the baby, his mother would come and care for both the baby as

19   well as care for the nine-year-old daughter as well.

20          When the defendant was transported for her initial

21   appearance on the complaint in this case, they realized that no

22   one may have told her that Greg had died since he died after

23   she was in custody.  And when told that he had passed away, she

24   showed no emotion.

25          Moving on to her physical and mental condition.  The

1  defendant self-reported to Greg and his family that she had

2  been diagnosed with bipolar disorder when she was around 15 to

3  16 years old.  That was also confirmed by the father of the

4  nine-year-old daughter who stated that in addition to bipolar

5  disorder she also had ADHD.  He thought in his interactions

6  with her she had been doing better and that he knew Greg was

7  trying to get her into some counseling to help with her mental

8  health concerns.

9       While pregnant and breastfeeding the defendant was not

10 taking medications.  There is no indication that she was still

11 breastfeeding at the time of her arrest.

12      During a search of the residence as well as looking at

13 some initial medical records from Fort Riley, it appears that

14 the defendant had been -- had been prescribed medications for

15 depression, mostly -- these medications were also located at

16 the residence.  There were several bottles with different dates

17 of refills.  Most of the prescription bottles were unused.

18      When looking at her family ties, she has very limited

19 family ties.  She has a mother who lives in Lincoln, Nebraska

20 near where the father of the nine-year-old child lives.  The

21 mother -- her mother has been diagnosed with PTSD from her own

22 military service as well as lupus, doesn't travel much, didn't

23 come to the couple's wedding, didn't visit when the baby was

24 born and in the hospital in Kansas City, Missouri after being

25 born premature.

1          The father of her nine-year-old describes their

2   relationship as being business-like, says that the

3   nine-year-old had never reported any issues with Greg, never

4   stated that she was scared of him in any way and the

5   defendant's *[sic]* parents believed that in many ways they were

6   probably closer to the defendant than she was to her own

7   family.

8          Regarding employment, she has no job.  Even before

9   moving to Fort Riley she was unable to keep steady employment.

10  The government believes that she has no financial resources.

11  She will not be eligible for military benefits while pending

12  charges for Greg's murder.

13         When looking at the length of residence in the

14  community, the family moved to Fort Riley in October of 2022.

15  Prior to moving to Fort Riley they lived with Greg's parents

16  near Pittsburg, Kansas and prior to that lived in the Lincoln,

17  Nebraska area.

18         Looking at her community ties as they pertain to Fort

19  Riley, she has no job, no family in the area.  It does not

20  appear if she had many close friends or much of a -- a support

21  circle at all on base.

22         When looking at past conduct, Greg's family reports

23  that they witnessed the defendant be verbally abusive towards

24  Greg, make threats on his life, call him the devil and human

25  filth, that they had witnessed the defendant place hands on

24-40011  USA v. Margaret E. Shafe  03.11.24                    14

1    Greg in a forceful manner and that they never saw Greg be

2    aggressive, either verbally or physically, towards the

3    defendant.

4         It was reported that the defendant would have good

5    weeks and then would have really bad weeks and that just prior

6    to the shooting had been -- had been some good times.

7         When looking at the history of drug and alcohol abuse,

8    it was reported that the defendant may be self-medicating for

9    her mental health issues with marijuana gummies and alcohol.

10   She had been described as a heavy drinker.  There was alcohol

11   located in the residence.  The government does not know if any

12   THC gummies were located during the search and, if they were,

13   if any testing or anything was done on those.

14        The defendant has no criminal history, therefore, no

15   record of non-appearance or non-compliance.  That moves

16   directly into the (g)(3)(B) factor.  Since she has no prior

17   criminal history, she's on no sort of -- no form of

18   supervision.

19        Lastly when looking at the final statutory factor, the

20   (g)(4) factor, the government would proffer that given the

21   defendant's history of mental health, given the interactions

22   she had with Greg in the short amount of time that they were

23   together that evening, given the fact that the children were in

24   the home and that she demonstrated an extreme act of violence

25   towards Greg, that she is a risk to others.  She's a risk to

1    the community and arguably she's a risk to herself.

2         The audio-recording proffered by the government

3    demonstrates this was not a heat of passion, it was not a

4    self-defense.  The only focus of the defendant during her --

5    her anger towards Greg - and anger is an understatement - was

6    how he had mistreated her and how he had wronged her.  And Greg

7    can be heard being calm and trying to lessen the situation.

8    This was also indicated by Private Dixon, who interacted with

9    the couple just minutes before the shooting happened as well.

10        That would be the government's proffered evidence at

11   this time, Your Honor.

12        THE COURT:  Thank you.

13        Ms. Amyx, Mr. Bartee.

14        MS. AMYX:  Thank you, Your Honor.  The facts as

15   enumerated by the government are certainly tragic and, Your

16   Honor, at this time we will not submit a counter-proffer.  At

17   some point in the future we may return to the court and ask to

18   retake up this issue.  But as the government announced, we have

19   not presented a release plan to probation because we are still

20   in the stages of building one.

21        Additionally, at this time the case is still in the

22   stage of death eligible for a punishment and, again, that may

23   be something which in the future would be a material change

24   depending on what investigation and the continued path of the

25   case ends up assessing, Your Honor.

1       With regards to that then we would stand silent with

2   regards to our request and ask the court to make the findings

3   consistent with the statute.

4       THE COURT:  Thank you.

5       All right.  That moves us into argument.  Normally I

6   would turn to the government on this.  Let me ask, is there an

7   intention by the defense to raise any argument today?

8       MS. AMYX:  No, Your Honor.  The defense will stand

9   silent.

10       THE COURT:  Okay.  Ms. Walton, if there's anything

11   else that -- on argument that you would like to make.

12       MS. WALTON:  The government will stand by the

13   proffered evidence.  We believe we have met our burden that

14   there is no conditions or combination of conditions, especially

15   in light of no presented release plan, that would reasonably

16   assure the defendant's appearance or the safety of others.  And

17   we would ask that she be detained.

18       THE COURT:  All right.  I am going to grant the

19   government's motion for pretrial detention.  There is not a --

20   unusually for the charge that we have, there is not a

21   rebuttable presumption in the statute.  So that is not a factor

22   that is part of my consideration today.

23       I do find that the government has proven both by clear

24   and convincing evidence that no condition or combination of

25   conditions of release will reasonably assure the safety of any

1   other person in the community and I also find by a

2   preponderance of the evidence that no condition or combination

3   of conditions of release will reasonably assure that the

4   defendant will appear as required.

5       I am, of course, mindful that the court is required to

6   impose the least restrictive conditions necessary to reasonably

7   assure both that she will appear and the safety of others and

8   to do that I've considered the Bail Reform Act factors which

9   are set forth in 18 U.S.C. Section 3142(g).

10      Normally I would note that part of my decision today

11  was based on the pretrial services report.  I'll just note for

12  the record that there is no pretrial services report here so,

13  instead, I have what has been proffered here during the hearing

14  today as well as the indictment.

15      I turn first to the (g)(1) factor, which is the nature

16  and circumstances of the alleged offense.  This is an offense

17  that involves a firearm.  In addition, this is an offense that

18  has extraordinary penalties attached to it, that it is both

19  punishable by life imprisonment and/or the death penalty.  And

20  those are both factors that weigh in favor of detention.

21      When I turn to the weight of the evidence, I do find

22  that there is strong evidence as proffered here today, both in

23  terms of confessions and other evidence as the government has

24  laid out today.

25      When I go to the (g)(3) factors, when I look at the

1   physical and mental health conditions, I do not have any

2   evidence today about any physical health conditions that are at

3   issue.  There is a proffer by the government with regard to

4   serious mental health conditions and that is a factor that

5   weighs in favor of detention.

6          With regard to family ties, there are no family ties

7   in this district as far as I can hear today.  There is a family

8   tie to Nebraska.  The government has proffered that that may

9   not be a strong family tie, but I'll note that there is at

10  least a tie to Nebraska.

11         There is no employment history and there are no

12  financial resources, which are factors that both weigh in favor

13  of detention.

14         In terms of the length of the residence in the

15  community, there is not a long history of ties really to any

16  community.  We have ties to Fort Riley that apparently began in

17  October of 2022.  That is certainly not a community to which

18  the defendant would be returning.

19         There was a period of time where she lived in

20  Pittsburg, Kansas.  I don't know the length of that time here

21  today.  And then there are ties to Nebraska, but none of those

22  ties are particularly strong with regard to what I have before

23  me today.

24         With regard to the past conduct, we do not have either

25  a criminal history or really the past conduct.  I will note

 1    there is a concern in this case that there was certainly not a

 2    call -- a 911 call made here, which gives me pause as it

 3    relates to that factor, but there is not the traditional

 4    conduct that we would normally look at of prior attempts to

 5    evade or -- or the like.

 6           With regard to the history of drug and alcohol abuse,

 7    again, I have limited information before me today.  We have

 8    what the government has proffered as it relates to her family's

 9    and her former spouse's knowledge of that.

10           We do have that there was an alcohol -- blood alcohol

11    test given in this case that would've put her right at or

12    perhaps over the blood alcohol level a few hours after the

13    incident that is set forth in the indictment.

14           We have no criminal history at all, which is a factor

15    that weighs against detention.  We have no prior history of

16    failing to appear at court appearances that would -- that is a

17    factor that weighs against detention.

18           The (g)(3)(B) factor is there's no history that she

19    was on probation, parole or other conditional release at the

20    time.

21           But when I look at the (g)(4) factor, the nature and

22    seriousness of the danger posed to others or the community,

23    that is one of the factors that weighs in favor of detention

24    here today.  The allegations are very serious, that someone was

25    shot in the face in close range, that this occurred in front of

1   two young children, a nine-year-old and a one-year-old.  The

2   nine-year-old who apparently was close enough to the events

3   that she was able to put on a video screen to her father the

4   body laying on the ground in the home.  That leads to very

5   serious concerns about the risk of danger that are posed.

6        The other piece here is the risk of flight.  These are

7   enormously serious penalties for this case and when you are

8   looking at the risk of the death penalty or the risk of life

9   imprisonment, those are certainly factors that may motivate

10  someone to not appear for court hearings and the seriousness of

11  the charge that is pending weighs in favor of that.

12        But the other piece we have here is that there was not

13  an attempt to bring law enforcement into the house when this

14  happened.  The two children were removed immediately, there was

15  an -- at least an intention to leave the base.  It appears she

16  may have turned around and come back for reasons that on this

17  record are not clear, but that leaves the court to have serious

18  concerns about whether she will appear as required,

19  particularly in light of the seriousness of the charge that is

20  pending.

21        I will write a separate order memorializing my ruling

22  here today, but let me say the other piece today is I don't

23  have a release plan or other possible conditions to consider

24  here today and that is a factor that I -- I have to consider as

25  to whether there's a combination of conditions here.  And

1  without a release plan or other facts relevant to the factors I

2  have to consider, I do find that the government has met its

3  burden on both of those -- both flight and danger to the

4  community.

5         Ms. Walton, is there anything else to take up today on

6  behalf of the government?

7         MS. WALTON:  No, Your Honor.

8         THE COURT:  Ms. Amyx, Mr. Bartee?

9         MR. BARTEE:  No, Your Honor.  Thank you.

10        THE COURT:  All right.  Ms. Shafe, what this means is

11  you're going to be remanded back to the custody of the U.S.

12  Marshals and that concludes your hearing here today and all of

13  our hearings this afternoon.

14        (Proceedings concluded).

15                            * * *

16                   C E R T I F I C A T E

17    I certify that the foregoing transcript is, to the best of

18  my ability, a full, true, and correct transcription of the

19  recorded proceedings as reflected by this transcript.

20    March 27, 2024.

21

22             /s/ Kelli Stewart_____
                KELLI STEWART, CSR, RPR, CRR, RMR
23             United States Court Reporter

24

25