# UNITED STATES DISTRICT COURT
## District of Kansas
(Topeka Docket)

UNITED STATES OF AMERICA,

     Plaintiff,

   v.          CASE NO. 24-40011-TC

MARGARET SHAFE,

     Defendant.

## GOVERNMENT'S SENTENCING MEMORADUM AND MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE

*"I am gonna kill him."*
*"I'm going to make him feel my fucking pain, and he just laughs at me."*
*"And you know I'm the one that gets the last laugh. And I've been trying – and I've been trying, and I want him dead!"*
*"I fucking hope you fucking die bitch. I hate you. Yeah, you're shaking."*
*"I'm fucking done with you."*

-- Margaret Shafe (the defendant) to G.S., February 19, 2024, at approximately 7:04pm

By 7:25pm, the defendant followed through on these threats and G.S. lay dying on the bathroom floor, suffering from a gunshot wound to the face. On February 14, 2025, nearly a year later, a jury convicted the defendant of murder in the second degree. The sentencing guideline range of 235-293 months, as calculated in the Presentence Investigation Report (PSR), is inadequate (Doc. 180). The sentencing

1

guideline range does not accurately reflect the defendant's reckless disregard for the safety of her two young daughters during and after the killing, her failure to render aid, the history of physical and emotional abuse the defendant inflicted on G.S., her lack of remorse and her attempts at victim blaming and humiliation. The United States contends that the circumstances of the offense necessitate an upward departure and/or variance from the guidelines and recommends the Court impose a sentence of 40 years.

Unlike the majority of sentencings before this Court, the Court heard the evidence presented at trial. The Court observed the witnesses, such as the defendant's daughter, M.M., an eyewitness to the killing, sit on the witness stand and describe the events surrounding February 19, 2024; the first responders who described the sounds coming from G.S. as they performed lifesaving measures on him; G.S.'s family members who described the tumultuous relationship between the defendant and G.S.; the defendant's statements to a cooperator while in custody; and this Court heard the couple's final argument which was recorded by G.S.. The Court has significant evidence before it on which to base its sentencing decision, and that evidence supports the imposition of a 40-year sentence.

I.     SENTENCING IN GENERAL

The sentencing court must engage in a three-part analysis to determine the appropriate sentence. First, the court must consider the Guideline range. A sentence imposed within the guideline range is presumptively reasonable. *See Rita v. United States*, 551 U.S. 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).

Second, the court must address any grounds for departure provided in the policy statements. Third, the court last considers the factors under 18 U.S.C. § 3553(a). See *Rita*, 551 U.S. at 351. The court's responsibility is to impose a sentence that is "sufficient" but "not greater than necessary" to meet the sentencing objectives in that provision. *United States v. Kaspereit*, 994 F.3d 1202, 1214 (10th Cir. 2021) (internal citations omitted). See also 2021 Guidelines Manual, § 1B1.1, pg. 17-18. See also 2021 Guidelines Manual, § 1B1.1, pg. 17-18.

## II.    THE SENTENCING GUIDELINES

The recommendations of the Sentencing Guidelines are no longer mandatory, but sentencing courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). The Sentencing Guidelines are "the 'starting point and the initial benchmark.'" *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007) (noting that the Guidelines should "be kept in mind throughout the process")).

On August 4, 2025, the United States Probation Office (USPO) prepared a Presentence Investigation Report (PSR) using the 2024 United States Sentencing Guidelines Manual (USSG). The guideline for a violation of 18 U.S.C. § 111(A) is USSG § 2A1.2(a). The base offense level for the defendant's conviction is 38. Section 2A1.2(a) does not provide for any offense specific adjustments. The defendant's criminal history category is I, resulting in a guideline imprisonment range of 235 months to 293 months. Neither party objects to the application of the Guidelines or the calculation in the revised PSR.

The defendant presented a series of factual and stylistic objections to the contents of the PSR which are documented in paragraphs 146 to 192 of the PSR. The government incorporates as reference its specific responses as included in the PSR. Pursuant to Rule 32(i)(3), the court may determine that a ruling on the disputed matter is unnecessary because it: (1) the matter will not affect sentencing; or (2) the court will not consider the matter at sentencing. The government encourages the Court to utilize its authority to decline to rule on the objections as they will not affect sentencing. Such a ruling does not preclude the defendant from including, for example, its theory of the evidence and why such evidence justifies the defendant's requested sentence. Especially in this matter, where the Court had the opportunity to hear and see all of the evidence presented at jury trial, the PSR serves the purpose of providing the court with an objective report of facts necessary to determine an advisory sentencing guideline. The PSR does not bind the Court to considering only the contents of the PSR when sentencing the defendant pursuant to 18 U.S.C. § 3553(a).

In summary, the government viewed the majority of the defendant's objections as attempts to control the narrative of the PSR and introduce non-verified information into the PSR. As noted in *United States v. Dingle*, the United States Probation Office is an arm of the court and not an investigative tool for either the prosecution or the defense. 546 F.2d 1378, 1380-81 (10th Cir. 1976). Further, the purpose of the PSR, as outlined by the Administrative Office of the United States Courts is to provide an objective report, including pertinent, verified facts, which are

applied to the advisory guidelines and statutes.  *See* Administrative Office of the United States Courts, Office of Probation and Pretrial Services, *The Pretrial Report*.

## III.     GOVERNMENT'S REQUEST FOR UPWARD DEPARTURE

An upward departure is appropriate in this case under U.S.S.G. §5K2.0(a)(1)(A) for aggravating circumstances and U.S.S.G. §5K2.0(a)(2)(A) for circumstances of a kind not adequately taken into consideration, as the defendant acted with extreme reckless disregard for the life and safety of her two minor children. Therefore, the government recommends a four-level upward departure to a Guideline offense level of 42, with a sentencing range of 360 months to life.  "The Sentencing Commission has explained that the sentencing court should treat each guideline as carving out a heartland, a set of typical cases embodying the conduct that each guideline describes. Accordingly, in an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether departure is warranted." *United States v. Hanson*, 264 F.3d 988, 993-94 (10th Cir. 2001) (quotations and citations omitted) and U.S.S.G. Chapter 1, Part A, pg. 7.  The Sentencing Commission further notes that it is "difficult to describe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." *Id*. at pg. 7

"[T]he propriety of an upward departure is . . . guided by the traditional four-part test, which inquires (1) whether the district court relied on permissible departure factors, (2) whether those factors removed a defendant from the applicable Guidelines heartland, (3) whether the record supports the district court's factual

bases for a departure, and (4) whether the degree of departure is reasonable." *United States v. Robertson*, 568 F.3d 1203, 1211 (10th Cir. 2009) (citation omitted).

### Departure Based Upon U.S.S.G. §5K2.0(a)(1) and (2)

The defendant should receive an upward departure pursuant to U.S.S.G. §5K2.0(a)(1)(A) and (2)(B). U.S.S.G. §5K2.0(a)(1)(A) provides that "the sentencing court may depart from the applicable guideline range if…in the case of offenses other than child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance." Additionally, U.S.S.G. §5K2.0(a)(2)(B) provides for departure in "the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining an appropriate sentence."

18 U.S.C. § 3553(b)(1) qualifies departures for aggravating or mitigating circumstances as those of "a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission…In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."

The defendant's murder of G.S. encompassed aggravating facts which are not considered by the Guidelines but must be considered in determining an appropriate sentence. The second-degree murder guideline, U.S.S.G. §2A1.2, has a base offense level of 38. It does not include any other adjustments under the guideline. This

6

guideline only considers that an individual was murdered. Further, none of the articulated Chapter 3 victim related adjustments or Chapter 5 departures apply to the defendant's conduct.

The defendant, while intoxicated, hurled threats of violence at G.S. for several minutes before he disengaged from the conflict and went outside the home. The defendant followed G.S. and continued to assert her intent to kill him before she turned, walked back into the home, and grabbed G.S.'s firearm. The defendant came back inside, walked up the stairs to the second floor, holding the couple's 11-month-old daughter, S.S. The defendant's 9-year-old daughter, M.M., was mere feet away from G.S. and S.S., in the bathroom, brushing her hair. The defendant, waiting for G.S. to reach the landing, fired a single round from G.S.'s firearm, striking G.S. in the face. Once struck, G.S. fell into the bathroom with M.M., and dropped S.S. to the floor. M.M. screamed and ran back into the small bathroom and hid, until she went to the hallway, picked up her sister, and called her dad, Jesse, to tell him that her mom just shot her stepdad. Jesse, panicked and scared for the safety of his daughter, frantically called 911, ultimately alerting authorities in Kansas to respond to the residence.

What the defendant did in the minutes after she shot G.S. are unknown. What she did not do, however, was immediately check on her young daughters to confirm they were not injured or comfort them, as M.M. hid in the shower and S.S. lay crying. She did not call 911 or render aid to G.S. Ultimately, she tells M.M. to grab S.S., hurry up, and get in the car and the defendant, while intoxicated, drove with M.M.

and S.S. unrestrained in the front seat to the gate of Fort Riley.

The defendant's actions are outside the heartland of homicide cases. The defendant risked the lives and safety of her own children when she killed G.S. The defendant fired the gun directly towards S.S. S.S. was defenseless, as her father held her, and she had not learned to walk. With G.S. holding S.S. as he was shot, he too was defenseless. M.M. stood only a few feet away from her mother, next to G.S. Any claim of necessity to kill G.S. at that moment was rejected by the jury and supported by the facts presented at trial that the killing was motivated by hatred and contempt, not fear. The defendant's conduct is not captured by the Guidelines, nor considered in policy statements, or official Commission commentary. Based on the Defendant's actions, a four-level upward departure under §5K2.0(a)(1) and (2) is appropriate in this atypical murder case.

## IV. GOVERNMENT'S ARGUMENTS IN SUPPORT OF AN UPWARD VARIANCE TO A TERM OF IMPRISONMENT OF 40 YEARS

A sentence of 40 years imprisonment is sufficient but not greater than necessary for this defendant who killed G.S., without justification, and risked the life and safety of her two young daughters. Further, throughout the history of the defendant's relationship and marriage to G.S., the defendant was physically and verbally abusive towards G.S., attempted to degrade and humiliate G.S., and has demonstrated a callous disregard for her actions and lack of remorse. An upward variance from the guideline range of 235-293 is not only appropriate, but necessary to account for the defendant's conduct.

"It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). 18 U.S.C. § 3553(a) provides seven statutory factors for the court to consider to impose a sentence that is sufficient, but not greater than necessary: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for a sentence to reflect the seriousness of the crime, deter future criminal conduct, prevent the defendant from committing more crimes and provide rehabilitation; (3) the sentences that are legally available; (4) the sentencings guidelines; (5) the Sentencing Commission's policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution. The sentencing court can and should engage in a holistic inquiry of these factors. *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014). A district court should not rely solely on one § 3553(a) factor without addressing other relevant factors. *United States v. Walker*, 844 F.3d 1253, 1259 (10th Cir. 2019). However, the district court need not afford equal weight to each § 3553(a) factor. *United States v. Cookson*, 922 F.3d 1079, 1094 (10th Cir. 2019).

On appellate review, the substantive reasonableness of the district court's application of the 18 U.S.C. § 3553(a) factors is reviewed under an abuse of discretion standard, looking at the totality of the circumstances. *Gall v. United States*, 552 U.S. 38, 46 (2007) and *Cookson*, 922 F.3d 1079, 1090 (10th Cir. 2019). This standard applies to a sentence imposed in or outside the advisory Guidelines range. *United*

*States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009) There is no presumption of unreasonableness applied to sentences outside the Guidelines range. *Cookson*, 922 F.3d at 1090. The appellate courts give due deference to the district court's decision that the § 3553(a) factors, on the whole, justify the extent of the variance. *Id.* at 1090–91. This is so because the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. *Gall* 552 U.S. at 38.

In conducting abuse of discretion review, the appellate court does not reweigh the sentencing factors. *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019). As long as the selected sentence does not exceed the bounds of permissible choice the sentence will be affirmed. *Barnes*, 890 F.3d at 915. A sentence is more likely to be within the bounds of reasonable choice when the court has provided a cogent and reasonable explanation for it. *Id.* at 917. A major variance should be supported by a more significant justification than a minor one. *Gall*, 552 U.S. at 50.

**The nature and circumstances of the offense and the history and characteristics of the defendant.**

First, the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. For this defendant, that requires the Court to weigh the gravity of her conduct with her as an individual.

*Nature and Circumstances of the Offense*

The nature and circumstances of the offense justify an upward variance to 40-years. Prior to the killing of G.S., the defendant spent the day at home with her one-year-old daughter, S.S., drinking. G.S. was home, off from work for the President's Day holiday. Around 3pm, G.S drove into Junction City, KS. While he was gone, the

defendant texted him and instigated an argument over his past infidelity, G.S.'s selfishness, and told him the only thing he brings to the table is money. G.S. ultimately texted the defendant: "My head says you should file; my heart says you shouldn't."

Once the defendant returned home, the defendant was enraged at G.S., still focused on his past infidelity and her own jealousy. She called her mother on Facetime at 7:04pm and began to make a series of threats against G.S. She threatened to kill G.S. and expressed her hope that he die multiple times in the 6-minute call. But G.S. did not raise his voice. He did not return her anger. By 7:11pm, G.S. disengaged and went outside, defeated and tired, to speak with his coworker and give him some equipment. The defendant followed him outside, walking toward the street and again, threatened his life. The defendant turned and walked back inside the house. She went upstairs, got the gun, and waited for G.S. to come inside and to the upstairs landing where she was waiting with the gun. A few minutes after the defendant returned to the residence, G.S. went inside, picked up S.S., who had been sitting on the first floor near the front window, and carried her upstairs. Once G.S., defenseless and hands full, got to the landing, the defendant was there, with the firearm ready to kill him. She fired a single shot, towards G.S. and S.S., that fatality struck G.S. in the face.

But S.S. was not the only child placed at risk. M.M., the defendant's nine-year-old daughter, was also next to G.S. at the time he was shot. Prior to the shooting, she was in the bathroom, taking a shower, while her mother screamed on the Facetime

call.  She was in the bathroom when her mother came back inside to get the gun to
kill G.S.  She was in the bathroom, with the door open, next to G.S. and S.S. when
her mother fired the gun at G.S.  G.S, after he was shot, dropped S.S. to floor, and fell
into the bathroom with M.M.  M.M., terrified, hid in the shower before walking over
her dying stepdad, picked S.S. up from the hallway floor and called her dad for help.
During this video call with her father, Jesse, M.M. showed him G.S.'s body. Jesse,
from Nebraska, hysterically notified authorities in Kansas that the defendant shot
G.S. *See United States v. Livingston*, 2022 WL 15570654 (10ᵗʰ Cir. 2022) (upward
variance based in part on presence of a three-year-old affirmed as substantively
reasonable).

The defendant's conduct immediately after she killed G.S. is the first example
of her callous disregard for her actions and the consequences of her actions on her
children.  The defendant did not call 911.  She did not immediately confirm that her
daughters were not injured, rather, she left them upstairs with G.S. as he laid
bleeding on the bathroom floor.  Ultimately, she took the girls and drove, intoxicated,
to the front gate of the installation.  At the gate, she did not tell anyone that G.S. lay
dying on the hallway floor or needed help.  Even hours later, when she was in an
interview room at the law enforcement center she did not ask if G.S. was alive.
Rather, she used the interview to attempt to paint G.S. as a porn addict and implied
that he had a sexual interest in children.   A theme that continued through trial and
was rejected by the jury as justification for her actions.

After the defendant was in pretrial detention, the defendant bragged about her

crime and that she killed G.S. because he cheated on her.  She told a cooperating witness she would kill G.S. again. She made comments about refusing to sign over his body for the family to bury him until her mother got her car. The defendant went so far as to throw a "fuck you" party on the defendant's birthday, making confetti from paper scraps the jail, reinforcing that she did intend on having the last laugh. The defendant showed a complete lack of remorse for her unjustifiable actions.

Lastly, the defendant's murder of G.S. did not occur in a vacuum.  Rather, it was the culmination of years of physical and verbal abuse. By the defendant's own admissions, when she dank, she became physical with G.S. The family of G.S. testified that from the beginning of G.S. and the defendant's relationship, the defendant would verbally abuse G.S. and engage in loud arguments, while G.S. would rarely raise his voice. Text messages between G.S. and the defendant corroborate this, demonstrating the defendant's pattern of emotional abuse and manipulation. The defendant consistently belittled G.S., threatened to leave him and take S.S., while G.S. often acquiesced to all her demands. *See Livingston*, at *1 (upward variance based in part on escalating criminal activity and history of domestic violence affirmed as substantively reasonable) and *United States v. Washington*, 2025 WL 1602766, *1 (10th Cir. 2025) (upward variance based in part on history of domestic violence affirmed as substantively reasonable).

The nature and circumstances of the defendant killing G.S. are egregious. They extend beyond the senseless and unjustified taking of a life.  The defendant had multiple opportunities to change course and to disengage from G.S. However, she

continued to escalate the situation until ultimately pointing and firing the gun at G.S. and put the life and safety of her own daughters at risk.

*History and Characteristics of the Defendant*

The defendant declined to be interviewed by USPO, therefore, the government has little verifiable information regarding the history and characteristic of the defendant. The defendant is 32 years old. She has no prior criminal history. She completed her GED. Based on the testimony presented at trial, the defendant had sporadic employment history and at the time of the offense, was unemployed. From text messages between G.S. and the defendant, the family may have experienced some financial troubles and argued about G.S. giving money to his family. The defendant and G.S. often discussed divorce and G.S. had sought out the advice of military legal counsel and marriage counseling.

The defendant has two children, M.M. and S.S. Her pregnancy with S.S. was difficult and S.S. was born premature. G.S.'s mother would often come to Fort Riley and care for S.S. and M.M. while the defendant was post-partum.

The defendant self-reported to G.S.'s family that she was diagnosed with bi-polar disorder. The defendant was proscribed Fluoxetine (commonly known as Prozac) and Vyvanse (ADHD medication), however appeared not to be medication compliant at several full prescription bottles were located in the home. The defendant was not receiving mental health services, despite free health care through the military. The defendant's mother testified that around age 13, the defendant was suicidal and was "hard to handle and acting up at school."

On balance, the nature and circumstances of the offense outweigh any mitigation presented by the defendant and her attempts at justification were rejected by the jury. *See Washington*, 2025 WL 1602766 at *6 (The district court explained why the nature and circumstances of the offense and the need to protect the public outweighed the evidence concerning defendant's mental health).

### The need for a sentence to reflect the seriousness of the crime, to promote respect for the law and to provide just punishment for the offense

Second, the sentence must reflect the seriousness of the crime, to promote respect for the law and to provide just punishment for the offense. Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976). Here, the seriousness of the crime, the need for deterrence, and just punishment justify a sentence of 40 years.

*Seriousness of the Crime*

The taking of a life without justification is arguably one of the most serious offenses in all criminal courts and deserving of stringent punishment. Congress has reflected the gravity of this offense with a statutory maximum sentence of life imprisonment. *See* 18 U.S.C. § 111(a). However, the crime of murder reverberates beyond the loss of life. G.S. was stripped of his opportunity to complete his military service, to watch his daughter take her first steps or go to her first prom. He lost the chance to see S.S. and M.M. succeed in academics, in the arts or athletics. He will no longer celebrate holidays, vacation in Florida, watch Arizona State sports or play

games with his siblings.

The victim's family continues to adjust to the loss of G.S.  The victim impact letters submitted to the Court illustrate the power of G.S.'s absence on his family, but they also highlight the love he had when he was alive.  His daughter, S.S., now lives with G.S.'s sister and the family has suffered through litigation in family court, fighting for permanent adoption.  The defendant encouraged her mother, Lisa Sebek, to oppose the custody arrangements, despite Ms. Sebek's lack of relationship with S.S. beyond sending the family money.  Additionally, immediately after the defendant killed G.S., his family was unable to bury their son in a timely manner because of the defendant purposefully delayed signing the proper releases.

Exposing the defendant's children to the murder of G.S. no doubt caused trauma for both girls. As demonstrated by the testimony provided by M.M. at trial, she is fully aware of impact of her mother's actions, by being present while the violent act occurred. While S.S. is young enough that she may not remember the specific events, that does not mean she will not have to live with the ramifications. Both girls will no longer have the family unit they had before, S.S. has lost a father, and M.M. has lost her stepfather. The defendant's actions have also taken the girl's mother away from them. Further, the girls will no longer be able to have a consistent relationship with each other, though their remaining family members still attempt to bring the girls together regularly to foster their relationship. While at this time it is difficult to understand the scope of the physiological trauma, it may become more apparent as they get older and miss out on milestones. However, there is no doubt

that the exposure to this violence will impact these girls in the future.

The seriousness of the offense conduct cannot be overstated. The defendant ended the life of G.S. when he was only 36 years old. Per the statistics gathered by the National Center for Disease Control, the average life expectancy for a male in the United States is 75.8 years. *See* https://www.cdc.gov/nchs/fastats/life-expectancy.htm. The defendant ended the defendant's life approximately 40 years too soon.

**The need for the sentence to deter future criminal conduct, prevent the defendant from committing more crimes and provide rehabilitation.**

*Deter Future Criminal Conduct and Protecting the Public*

A long custodial sentence is necessary to minimize the risk of harm to the public posed by the defendant. The defendant's evidence to justify her murder of G.S. was rejected by the jury. The defendant has provided no evidence that she was acting under extreme duress or as a result of a mental condition. Rather, the evidence demonstrated that she was acting out of anger. Anger that was a common occurrence. Anger that arose because G.S. was not acquiescing to her demands in the marriage. The defendant exhibited the inability to control that anger and is a threat to anyone who she may encounter while she is emotionally charged. She not only presents a risk of harm to others through her shooting of the defendant, but also through her reckless decision making to place her daughters at risk during the shooting and after. *See United States v. McGuire*, 2024 WL 2873776 (10th Cir. 2024) (District Court concluded life sentence was necessary for protection of public through incapacitation; upheld on appeal).

*Prevention and Rehabilitation*

A 40-year sentence will protect the public from further crimes of the defendant and provide the defendant with the resources and opportunity for rehabilitation. While in the Bureau of Prisons, the defendant will have access to vocational training and college courses. If necessary, she will also have access to mental health services, including individual and group therapy.

**The sentences that are legally available.**

Third, Congress authorized the court to sentence the defendant to lifetime imprisonment, recognizing that there would be circumstances surrounding second degree murder that warrant lifetime incarceration. Likewise, the Tenth Circuit has affirmed the substantive reasonableness of a lifetime sentence for second degree murder. *See Washington,* 2025 WL 1602766 and *McGuire*, 2024 WL 2873776.

**The sentencing Guidelines.**

Fourth, the Court must consider the sentencing Guidelines. As previously argued in the government's request for a departure, the Guidelines do not adequately account for the circumstances surrounding the defendant's conduct. The Guidelines do not provide any applicable enhancements for the risk of death or injury to others during the commission of the murder. In contrast, the Guidelines treat all second degree murders the same for the purpose of calculating a guideline sentencing range, in direct contraction with the court's requirement to apply the 3553(a) factors and look at the specific circumstances of the offense and the perpetrator. Specifically for this defendant, the guideline range ignores the fact that the defendant placed S.S.

and M.M. in risk of death or injury when she killed G.S. The Court should consider them as advisory and vary upward to adjust for the specific facts of the offense.

**The Sentencing Commission's policy statements.**

Fifth, the Sentencing Commission's policy statements focus on the three Congressional objectives of the Sentencing Reform Act of 1984: (1) combat crime through an effective, fair sentencing system; (2) create reasonable uniformity in sentencing and (3) create proportionality in sentencing through a system that imposes appropriately different sentence for criminal conduct of differing severity. See 2024 Guidelines Manual, pg. 1-5.

**The need to avoid unwarranted sentence disparities.**

Sixth, the Court must consider the need to avoid unwarranted sentence disparities. When a district court "correctly calculates and carefully reviews the Guidelines range, it necessarily gives significant weight and consideration to the need to avoid unwarranted disparities," *Gall*, 552 U.S. at 54. Additionally, the Tenth Circuit has emphasized the importance of the word *unwarranted* and noted that reports on national averages are not dispositive because they do not provide information into a defendant's individual history and characteristics. *United States v. Lucero*, 130 F.4th 877, 887 (10th Cir. 2025). In *Washington*, the Tenth Circuit recently highlighted the need to avoid unwarranted sentencing disparities among with defendants with similar records *who have been found guilty of similar conduct.* 2025 WL 1602766 at *7 and 8 (italics in original).

A sentence of 40 years, although outside the average range, would not be an unwarranted disparity for a defendant who committed an unjustified murder while endangering her two young children, factors not otherwise considered by the guidelines.

**The need for restitution.**

Lastly, seventh, the need for restitution is a factor the Court should consider. No restitution is requested; therefore, this factor has minimal impact on the government's recommended sentence.

V.     CONCLUSION

The government asserts a 40-year sentence is appropriate for the specific factors identified above. The guidelines do not adequately consider the facts surrounding the defendant's actions; therefore, an upward departure is warranted. Alternatively, an upward variance is also appropriate, for the same reason; the advisory sentencing guidelines do not properly consider the facts of this offense. As it stands, the guideline range of 235-293 woefully underrepresents the seriousness of the defendant's conduct, the harm she has caused, and the danger she exposed her children to.  A sentence within the Guideline range, assuming a reduction of 20%, would result in the defendant's release before S.S. reaches 21.  A sentence of 40 years not only accounts for the 40 years of life the defendant lost, but it also allows S.S. and M.M. to be well into adulthood before they face the decision whether to allow the defendant back into their lives.  A sentence of 40 years is sufficient, but not greater than necessary to achieve the sentencing objectives of 18 U.S.C. § 3553.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney


/s/ Sara L. Walton
Sara L. Walton, KS Bar No. 24106
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
sara.walton@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Sara L. Walton
Sara L. Walton
Assistant United States Attorney